KIRBY McINERNEY LLP
Robert J. Gralewski, Jr. (#196410)
600 B Street, Suite 2110
San Diego, California 92101
Telephone: (619) 784-1442
Email: bgralewski@kmllp.com

Ira M. Press
Thomas W. Elrod
250 Park Avenue, Suite 820
New York, New York 10177
Telephone: (212) 371-6600
Facsimile: (212) 751-2540
Email: ipress@kmllp.com
        telrod@kmllp.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUBRAMANIAN LALGUDI, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> ALTERYX, INC., DEAN A. STOECKER, and KEVIN RUBIN, <br><br> Defendants. | Case No. 8:20-cv-01910 <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |

Plaintiff Subramanian Lalgudi ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Alteryx, Inc. ("Alteryx" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued and disseminated by Alteryx; and (c) review of other publicly available information concerning Alteryx.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Alteryx securities between May 6, 2020 and August 7, 2020, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

4.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

5.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

6.     Plaintiff Subramanian Lalgudi, as set forth in the accompanying certification, incorporated by reference herein, purchased Alteryx securities during the Class Period, and suffered damages as a result of the federal securities law violations, false and/or misleading statements, and/or material omissions alleged herein.

7.     Defendant Alteryx is incorporated under the laws of Delaware with its principal executive offices located in Irvine, California. Alteryx's Class A common stock trades on the New York Stock Exchange ("NYSE") under the symbol "AYX."

8.     Defendant Dean A. Stoecker ("Stoecker") was the Company's Chief Executive Officer ("CEO") at all relevant times.

9.     Defendant Kevin Rubin ("Rubin") was the Company's Chief Financial Officer ("CFO") at all relevant times.

10.     Defendants Stoecker and Rubin (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases - alleged herein to be misleading - prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then

materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

11.     Alteryx purports to be a leader in analytic process automation. The Company offers a subscription-based platform that customers can use to access, prepare, and analyze data from a multitude of sources, then deploy and share analytics at scale to make data-driven decisions.

### Materially False and Misleading

### Statements Issued During the Class Period

12.     The Class Period begins on May 6, 2020. On that day, the Company announced its first quarter 2020 financial results in a press release that stated, in relevant part:

> "Alteryx delivered solid results and crossed over $400 million in annual recurring revenue in the first quarter, ***despite an abrupt and significant change in customer buying behavior late in the quarter***," said Dean Stoecker, CEO of Alteryx, Inc. "In these challenging times, we believe the importance of data has never been greater, and we remain focused on and committed to helping our customers leverage data to better navigate these circumstances."

**First Quarter 2020 Financial Highlights**

- **Revenue:** Revenue for the first quarter of 2020 was $108.8 million, an increase of 43%, compared to revenue of $76.0 million in the first quarter of 2019.

- **Gross Profit:** GAAP gross profit for the first quarter of 2020 was $95.8 million, or a GAAP gross margin of 88%, compared to GAAP gross profit of $68.0 million, or a GAAP gross margin of 89%, in the first quarter of 2019. Non-GAAP gross profit for the first quarter of 2020 was $99.4 million, or a non-GAAP gross margin of 91%, compared to non-GAAP gross profit of $68.8 million, or a non-GAAP gross margin of 90%, in the first quarter of 2019.

- **Income (Loss) from Operations:** GAAP loss from operations for the first quarter of 2020 was $(20.1) million, compared to GAAP loss from operations of $(4.4) million for the first quarter of 2019. Non-GAAP loss from operations for the first quarter of 2020 was $(3.2) million, compared to non-GAAP income from operations of $1.4 million for the first quarter of 2019.

- **Net Income (Loss):** GAAP net loss attributable to common stockholders for the first quarter of 2020 was $(15.5) million, compared to GAAP net income of $5.9 million for the first quarter of 2019. GAAP net loss per diluted share for the first quarter of 2020 was $(0.24), based on 65.6 million GAAP weighted-average diluted shares outstanding, compared to GAAP net income per diluted share of $0.09, based on 67.5 million GAAP weighted-average diluted shares outstanding for the first quarter of 2019.

*    *    *

**Financial Outlook**

As of May 6, 2020, we are providing guidance for the second quarter of 2020 as described below. Given uncertainties related to the ongoing novel coronavirus and coronavirus disease, or COVID-19 pandemic, and rapidly changing global economic environment, we are withdrawing our previously issued full-year 2020 guidance provided on February 13, 2020.

- **Second Quarter 2020 Guidance:**

  - Revenue is expected to be in the range of $91.0 million to $95.0 million, an increase of 10% to 15% year-over-year.

  - Non-GAAP loss from operations is expected to be in the range of $(9.0) million to $(13.0) million.

  - Non-GAAP net loss per share is expected to be in the range of $(0.12) to $(0.18) based on approximately 67.0 million non-GAAP weighted-average diluted shares outstanding.

(Emphasis added.)

13.    On May 7, 2020, Alteryx filed its quarterly report on Form 10-Q with the SEC for the period that ended March 31, 2020. The Company's Quarterly Report on Form 10-Q was signed by Defendants Stoecker and Rubin. Therein, the Company affirmed the previously reported financial results reported on May 6, 2020. Therein, the Company also stated, in relevant part:

***If we are unable to attract new customers, expand sales to existing customers, both domestically and internationally, and maintain the subscription amount and subscription term to renewing customers, our revenue growth could be slower than we expect and our business may be harmed.***

Our future revenue growth depends in part upon increasing our customer base. Our ability to achieve significant growth in revenue in the future will depend, in large part, upon the effectiveness of our marketing efforts, both domestically and internationally, and our ability to attract new customers. In particular, we are dependent upon lead generation

strategies to drive our sales and revenue. If these marketing strategies fail to continue to generate sufficient sales opportunities necessary to increase our revenue and to the extent that we are unable to successfully attract and expand our customer base, we will not realize the intended benefits of these marketing strategies and our ability to grow our revenue may be adversely affected.

Demand for our platform by new customers may also be affected by a number of factors, many of which are beyond our control, such as continued market acceptance of our platform for existing and new use cases, the timing of development and new releases of our software, technological change, growth or contraction in our addressable market, and accessibility across operating systems. . . .

Our customers generally enter into license agreements with one to three year subscription terms and generally have no obligation or contractual right to renew their subscriptions after the expiration of their initial subscription period. ***New customers may enter into license agreements for lower subscription amounts or for shorter subscription terms than we anticipate, which reduces our ability to forecast revenue growth accurately. Moreover, our customers may not renew their subscriptions and those customers that do renew their subscriptions may renew for lower subscription amounts or for shorter subscription terms.*** Customer renewal rates may decline or fluctuate as a result of a number of factors, including the breadth of early deployment, reductions in our customers' spending levels, our pricing or pricing structure, the pricing or capabilities of products or services offered by our competitors, our customers' satisfaction or dissatisfaction with our platform, or the effects of economic conditions, including as a result of the COVID-19 pandemic. If our customers do not renew their agreements with us, or renew on terms less favorable to us, our revenue may decline.

(Emphasis added.)

14.    The above statements identified in ¶¶ 12-13 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company was unable to close large deals within the quarter and deals were pushed out to subsequent quarters or downsized; (2) that, as a result, Alteryx increasingly relied on adoption licenses to attract new customers; (3) that, as a result and due to the nature of adoption licenses, the Company's revenue was reasonably likely to decline; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## Disclosures at the End of the Class Period

15.    On August 6, 2020, after the market closed, Alteryx announced its second quarter 2020 financial results, and stated that the Company expected only 10% to 11% revenue growth for the full year, and 7% to 11% revenue growth for the third quarter of 2020 (as compared to the same period in 2019). Specifically, Alteryx stated in a press release, in relevant part:

**Second Quarter 2020 and Recent Business Highlights**

- Ended the second quarter of 2020 with 6,714 customers, a 27% increase from the second quarter of 2019. Added 271 net new customers in the second quarter of 2020.

- Achieved a dollar-based net expansion rate (annual contract value based) of 126% for the second quarter of 2020.

- Ended the quarter with over $430.0 million in annual recurring revenue (ARR), an increase of over 40% year-over-year.

*        *        *

- **Third Quarter 2020 Guidance**:

  - Revenue is expected to be in the range of $111.0 million to $115.0 million, an increase of 7% to 11% year-over-year.

  - Non-GAAP income from operations is expected to be in the range of $8.0 million to $12.0 million.

  - Non-GAAP net income per share is expected to be in the range of $0.09 to $0.14 based on approximately 71.0 million non-GAAP weighted-average diluted shares outstanding.

- **Full Year 2020 Guidance**:

  - Revenue is expected to be in the range of $460.0 million to $465.0 million, an increase of 10% to 11% year-over-year.

  - Annual recurring revenue is expected to be approximately $500.0 million as of December 31, 2020, an increase of over 30% year-over-year.

16.    Alteryx hosted a conference call with investors and analysts to discuss the second quarter 2020 results on August 6, 2020 at 5 p.m. Eastern Time. During the call, defendant Stoecker disclosed that customers' buying behaviors resulted in "notable changes, such as higher levels of scrutiny on spending across all sectors,

resulting in longer sales cycles, smaller deal sizes and less favorable linearity in the quarter." Defendant Rubin provided further details, stating:

> Last quarter, we highlighted that new business activity in April was consistent with the levels in April 2019. This gave us some degree of confidence that customers were reengaging after the abrupt slowdown we saw at the end of March.
>
> However, as we have typical software linearity in our business, meaning the majority of our bookings are generally concentrated in the back half of the quarter, changes in customer buying behavior did not become apparent to us until later in the quarter. These changes included elongated sales cycles resulting from customers having more robust approval processes and higher levels of scrutiny, smaller deal sizes and less favorable linearity with some transactions slipping into Q3. . . . The changes in customer buying behavior were most evident in our expansion business, particularly for transactions that were not attached to a renewal. Along with these trends, sales and marketing productivity declined for the quarter, and we saw a moderate increase in our churn rates globally.

17.     During the conference call, Defendant Stoecker further disclosed that Alteryx "increased [the] use of adoption licenses" in response. He explained:

> To address this new normal of buying behavior, we increased our use of adoption licenses. An adoption license is a short term contract, generally six months, that allows the customer to effectively take Alteryx for an extended test drive to prove value and gauge demand before they make a longer term commitment.
>
> Adoption licenses [] allow us to engage with broader audiences at larger enterprise[s] for an extended period of time to help prove out digital transformation initiatives. It is also a way for us to continue to engage with and support our customers in these trying times. It also acts as an insurance policy of sorts for our customers. In Q2, adoption agreements increased by over 60% year over year and more than 100% sequentially.

18.     During the conference call, Defendant Stoecker revealed that, despite the use of adoption licenses, Alteryx continued to experience "high customer churn." He disclosed that "[d]ollar-based churn was predominantly seen in downsized contracts" and "customer churn continued to be concentrated in the commercial sector, which we define as less than $100 million in annual revenue regardless of the vertical." He further stated:

> I think the elongated sales cycles occurred across the entirety of the base of the business. I think that the churn was mostly impacted in commercial businesses, much of it in the highly impacted verticals. But at the same

time, 20% of our new customers came from high-risk verticals, tending to be in larger organizations in those verticals.

19.    Analysts sought to determine the long-term impact of the numerous factors—elongated sales cycles, smaller deal sizes, customer churn, and use of adoption licenses—that Alteryx had offered to explain the earnings miss. Specifically, during the call, an analyst asked about annual recurring revenue ("ARR"), how it grew in the first quarter 2020, and how it had grown in 2019. But defendant Rubin merely stated: "It is a metric that we've kind of drifted out at various different milestones over the years. And more recently, we did provide it in both Q1 and now going forward. We aren't providing what those interim periods are, but I think there's enough information you can kind of interpolate to come up with your own estimate."

20.    Following this discussion, analysts issued reports interpreting the results. For example, on August 7, 2020, J.P. Morgan issued a report stating: "Alteryx saw sales cycles elongate, initial lands turn smaller, and churn elevate. . . . Full year revenue guidance implies a negative growth rate in Q4, something investors may not have conceived to be possible earlier in the year[.]" (emphases omitted). The report went on to state that "investors looked at the Q2 guidance provided in Q1 as highly conservative, but are now seeing the severity of the bookings impacts flow through the financial model."

21.    Also on August 7, 2020, Guggenheim published a report stating that for Alteryx, ARR is "the most accurate metric to assess AYX's momentum given its revenue model." However, the Company has only reported ARR in some quarters, and the analyst inferred that the "'new ARR' added in Q2'20 was ~$20m and was down y/y and q/q [i.e. year-over-year and quarter-over-quarter]."

22.    Oppenheimer issued a report the same day, affirming that the host of problems disclosed in the second quarter 2020 earnings report dampened expectations for the rest of the fiscal year: "With little visibility into when customer activity

(delayed spending/slower expansion, churn, and smaller deals) might normalize, management lowered expectations for 2020 (implying 4Q renewals pressure)."

23.    On this news, Alteryx's stock price fell $47.62, or more than 28%, to close at $121.38 per share on August 7, 2020, on unusually heavy trading volume.

24.    On August 7, 2020, after the market closed, the Company filed its Quarterly Report on Form 10-Q for the period ended June 30, 2020. Therein, Alteryx further disclosed, in relevant part:

> During the three and six months ended June 30, 2020, we continued to experience significant changes in customer buying behavior that began in March as a result of the impact of the COVID-19 pandemic, including decreased customer engagement and delayed sales cycles. Specifically, economic challenges that enterprise customers in certain verticals have experienced, as well as weakness in our commercial segment that targets small- and medium-sized businesses, have adversely impacted the length of the sales cycle and the expansion and new business sales with these customers. As a result of these changes, we experienced a decrease in revenue from the three months ended June 30, 2020 as compared to the three months ended March 31, 2020 and deterioration in near-term demand, and saw key business metrics, including our dollar-based net expansion rate, decrease quarter over quarter. See *Key Business Metrics* and *Results of Operations* for further discussion. Further, as a result of the impact of the COVID-19 pandemic on our operating results for the three months ended June 30, 2020, we expect our business in fiscal 2020 to continue to perform at levels lower than planned prior to the COVID-19 pandemic.

25.    Under "Results of Operations," regarding revenue, the Company's Quarterly Report on Form 10-Q also stated:

> The decrease in subscription-based software license revenue for the three months ended June 30, 2020 as compared to the three months ended June 30, 2019 was primarily due to a decrease in sales to new and existing customers and average transaction size as customers have slowed or delayed purchases due to the impact of the ongoing COVID-19 pandemic. Although our growth and expansion rates have decreased during the three months ended June 30, 2020, our total number of customers increased from 5,278 as of June 30, 2019 to 6,714 as of June 30, 2020, and our customer base expanded its use of our platform as shown by our dollar-based net expansion rate of 126%.

26.    On this news, Alteryx's stock price fell $12.15, or 10%, to close at $109.23 per share on August 10, 2020, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

27.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Alteryx securities between May 6, 2020 and August 7, 2020, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

28.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Alteryx's Class A common shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Alteryx Class A common stock were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Alteryx or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

29.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

30.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

31.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

1          (a)     whether the federal securities laws were violated by Defendants'

2  acts as alleged herein;

3          (b)     whether statements made by Defendants to the investing public

4  during the Class Period omitted and/or misrepresented material facts about the

5  business, operations, and prospects of Alteryx; and

6          (c)     to what extent the members of the Class have sustained damages

7  and the proper measure of damages.

8      32.    A class action is superior to all other available methods for the fair and

9  efficient adjudication of this controversy since joinder of all members is

10  impracticable. Furthermore, as the damages suffered by individual Class members

11  may be relatively small, the expense and burden of individual litigation makes it

12  impossible for members of the Class to individually redress the wrongs done to them.

13  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

15      33.    The market for Alteryx's securities was open, well-developed, and

16  efficient at all relevant times. As a result of these materially false and/or misleading

17  statements, and/or failures to disclose, Alteryx's securities traded at artificially

18  inflated prices during the Class Period. Plaintiff and other members of the Class

19  purchased or otherwise acquired Alteryx's securities relying upon the integrity of the

20  market price of the Company's securities and market information relating to Alteryx,

21  and have been damaged thereby.

22      34.    During the Class Period, Defendants materially misled the investing

23  public, thereby inflating the price of Alteryx's securities, by publicly issuing false

24  and/or misleading statements and/or omitting to disclose material facts necessary to

25  make Defendants' statements, as set forth herein, not false and/or misleading. The

26  statements and omissions were materially false and/or misleading because they failed

27  to disclose material adverse information and/or misrepresented the truth about

28  Alteryx's business, operations, and prospects as alleged herein.

35.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made, or caused to be made, a series of materially false and/or misleading statements about Alteryx's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

36.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

37.    During the Class Period, Plaintiff and the Class purchased Alteryx's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

38.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set

forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Alteryx, their control over, and/or receipt and/or modification of, Alteryx's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Alteryx, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

39.     The market for Alteryx's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Alteryx's securities traded at artificially inflated prices during the Class Period. On June 9, 2020, the Company's share price closed at a Class Period high of $181.98 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Alteryx's securities and market information relating to Alteryx, and have been damaged thereby.

40.     During the Class Period, the artificial inflation of Alteryx's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made, or caused to be made, a series of materially false and/or misleading statements about Alteryx's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Alteryx and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the

Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

41.    At all relevant times, the market for Alteryx's securities was an efficient market for the following reasons, among others:

(a)    Alteryx shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Alteryx filed periodic public reports with the SEC and/or the NYSE;

(c)    Alteryx regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Alteryx was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

42.    As a result of the foregoing, the market for Alteryx's securities promptly digested current information regarding Alteryx from all publicly available sources and reflected such information in Alteryx's share price. Under these circumstances, all purchasers of Alteryx's securities during the Class Period suffered similar injury through their purchase of Alteryx's securities at artificially inflated prices and a presumption of reliance applies.

43.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's

business operations and financial prospects—information that Defendants were obligated to disclose—, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material, in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

### NO SAFE HARBOR

44.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Alteryx who knew that the statement was false when made.

### FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

45.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

46.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Alteryx's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

47.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Alteryx's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

48.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Alteryx's financial well-being and prospects, as specified herein.

49.     Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Alteryx's value, performance, and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Alteryx, its business operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business

1    which operated as a fraud and deceit upon the purchasers of the Company's securities

2    during the Class Period.

3        50.    Each of the Individual Defendants' primary liability and controlling

4    person liability arises from the following facts: (i) the Individual Defendants were

5    high-level executives and/or directors at the Company during the Class Period and

6    members of the Company's management team, or had control thereof; (ii) each of

7    these Defendants, by virtue of their responsibilities and activities as a senior officer

8    and/or director of the Company, was privy to and participated in the creation,

9    development, and reporting of the Company's internal budgets, plans, projections,

10   and/or reports; (iii) each of these Defendants enjoyed significant personal contact and

11   familiarity with the other Defendants and was advised of, and had access to, other

12   members of the Company's management team, internal reports, and other data and

13   information about the Company's finances, operations, and sales at all relevant times;

14   and (iv) each of these Defendants was aware of the Company's dissemination of

15   information to the investing public which they knew and/or recklessly disregarded

16   was materially false and misleading.

17       51.    Defendants had actual knowledge of the misrepresentations and/or

18   omissions of material facts set forth herein, or acted with reckless disregard for the

19   truth in that they failed to ascertain and to disclose such facts, even though such facts

20   were available to them. Such Defendants' material misrepresentations and/or

21   omissions were done knowingly or recklessly, and for the purpose and effect of

22   concealing Alteryx's financial well-being and prospects from the investing public and

23   supporting the artificially inflated price of its securities. As demonstrated by

24   Defendants' overstatements and/or misstatements of the Company's business,

25   operations, financial well-being, and prospects throughout the Class Period,

26   Defendants, if they did not have actual knowledge of the misrepresentations and/or

27   omissions alleged, were reckless in failing to obtain such knowledge by deliberately

28

refraining from taking those steps necessary to discover whether those statements were false or misleading.

52.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Alteryx's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Alteryx's securities during the Class Period at artificially high prices and were damaged thereby.

53.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Alteryx was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Alteryx securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

54.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

55.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

56.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

57.     Individual Defendants acted as controlling persons of Alteryx within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights; participation in, and/or awareness of, the Company's operations; and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

58.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

59.     As set forth above, Alteryx and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered

damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: October 2, 2020

**KIRBY MCINERNEY LLP**

By: *Robert J. Gralewski, Jr*
_____
KIRBY McINERNEY LLP
Robert J. Gralewski, Jr. (#196410)
600 B Street, Suite 2110
San Diego, California 92101
Telephone: (619) 784-1442
Email: bgralewski@kmllp.com

Ira M. Press
Thomas W. Elrod
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: (212) 371-6600
Facsimile: (212) 751-2540
Email: ipress@kmllp.com
       telrod@kmllp.com

*Attorneys for Plaintiff Subramanian Lalgudi*